## PATENTS, Inc., v. GILLETTE SAFETY RAZOR CO.

### No. 1226.

District Court, D. Delaware.
Aug. 9, 1939.

Theodore S. Kenyon and Frederick Bachman (of Kenyon & Kenyon), both of New York City, and Charles F. Richards (of Richards, Layton & Finger), of Wilmington, Del., for plaintiff.

Henry R. Ashton and William J. Barnes (of Fish, Richardson & Neave), both of New York City, and Herbert L. Cohen, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a suit for infringement of Claims 2, 3, 4 and 7 of Swan U. S. Patent No. 2,046,219 for "Safety Razor" issued June 30, 1936, on an application filed October 17, 1930. The defenses are invalidity, noninfringement and abandonment.

Plaintiff charges infringement by the manufacture and sale of five types of Gillette razors with standard Gillette cutout corner blades, viz.: (1) The original Gillette razor; (2) the New Improved razor; (3) the Bostonian razor; (4) the Aristocrat razor; and (5) the Sheraton razor.

In 1926 Swan filed in the British Patent Office a provisional application for a patent for "An Improved Safety Razor". No drawing was furnished. The application was never followed up by the filing of a complete specification and became forfeited. In the application the only stated object was provision for diagonal wheels to give the razor a diagonal stroke. The wheels were arranged below the blade and left the sharp corners unprotected. In a model made in London Swan retained the old end guard lips of the conventional Gillette razor "to prevent any risk of the corner of the blade catching in the skin". He projected the lips into the plane of the blade and cut out the corners of the blade. At the end of the provisional specification Swan left it optional whether the corners be cut out.

January 14, 1927, Swan obtained in England a design registration of a blade with rounded corners. Shortly thereafter he came to this country. The only invention he then claimed to have made was a razor having wheels to provide a diagonal stroke. The guard lips took the place of the end guard teeth of the conventional razor to prevent, as he said, the corners of the blade cutting the skin. Swan had friends in this country who could have financed his razor. None were interested. In 1928 he laid aside his invention. In January, 1929, he took a job in a brokerage office. In June, 1929, he quit brokerage to exploit the old type Gillette blade in a slot machine which he had designed and for which he filed a patent application. To manufacture the machine he organized the Triple-X Corporation and raised $20,000. If he had had any idea his cutout corner blade was useful he could have manufactured and sold it. Swan admits he had no idea of cutting the corners of the blade to "span the cap corners" of the razor. That function is referred to in Claim 4 of the Swan patent but originated in Thompson's application in the Patent Office.

October 17, 1930, application for the patent in suit was filed. This was nearly four years after Swan came to this country to exploit his invention with wheels. Swan admits that several months before filing an application in the United States Patent Office he had obtained full knowledge of defendant's razor with reinforced cap corners and cutout corners of the blade. In April, 1929, the Thompson application was filed. As early as January, 1930, the Thompson razor and blade had been sold on the market. In the Saturday Evening Post of March 8, 1930, the Thompson razor and blade were fully described as well as its functions. Swan read this description. Swan filed an affidavit in his brother's application in the United States Patent Office stating that he knew about Thompson's claims on October 7, 1930. Afterwards he filed his application and in that application he embodied the Thompson claim to a cutout corner blade to span the cap corners. He discarded the object stated in his British provisional specification. He stated the nature, objects and advantages of his invention "will become apparent from consideration of the following specification taken in conjunction with the accompanying drawings" &c. He sought to use his discarded device to cover the very different idea of Thompson. In his application he gave prominence to guard lips and the cutout corners of the blade. Only in the two last claims did Swan make any reference to the guard wheels. These claims were rejected by the Patent Office on the British Rawson patent No. 26,355 of 1909, which anticipated everything in the guard wheel idea.

Defendant began to manufacture the original Gillette razor in 1903. By 1926 defendant had sold more than 40,000,000 razors. The sole function of the blade cutout corners in this razor was to avoid pos-

sible burrs on the cap corners. The New Improved razor is identical with the original Gillette except the fulcrum edges. Neither holder member has projections. The sole function of the blade cutout is still to avoid burrs on the cap corners whenever the cap is dropped. The lugs on each of the cap corners in the Bostonian razor are to reinforce the corners to prevent damage. They do not guard the corners of the blade. The end guard teeth guard the corners of the blade. The Aristocrat and Sheraton razors are identical with the original Gillette as respects the guard. They do not have fulcrum edges nor guarding projections. These razors are of one piece in which the upper clamp members may be swung open like trap doors by turning the handle. The upper clamping members, being permanently attached to the rest of the razor, can not be dropped separately. The effect of dropping the Aristocrat or Sheraton razor is to bend the corner links and other parts so that the razor will not close. The corner links neither perform the function of Thompson's reinforcements, such as were used in the Bostonian razor, nor do they perform the guarding function of the Swan guard lips. Swan did not show his blade to Thompson. Neither Thompson nor the defendant got the idea of cutting out the corners of the blade or providing reinforcing lugs on the cap corners from Swan.

Claim 4 of the Swan patent is typical and reads:

"4. A safety razor comprising a flexible and elastic blade of oblong contour and internally apertured to receive positioning and clamping means, a guard member adapted to support the blade adjacent to the side edges of the latter, a transversely-concaved blade-clamping cap provided with parallel side edges, means for positioning the blade between the cap and the guard member, and means for clamping said parts together and simultaneously causing the side edges of the cap to flex the blade transversely on the guard member as a fulcrum, the blade being provided with unsharpened ends and with reentrant recesses located at its corner portions respectively and each extending both longitudinally and transversely of the blade and cap to such an extent as to span the corresponding cap corner and provide a clearance space of sufficient area to receive said cap corner if bent toward the guard member, whereby a bent cap corner is pre-

vented from exerting pressure on the blade while being flexed or when clamped and thereby breaking the blade or distorting its cutting edge."

The main feature of each of the claims in suit is the cutout corners in the blade. They are the heart of the alleged invention as claimed. If validity is to be attributed to any of the claims it must be based primarily upon the provision of these cutout corners.

The only function which Swan's guard lips were capable of serving in the razors disclosed in his patent was to guard the blade corners and prevent the razor from cutting the user. If the guarding of the corners of the blade in a safety razor could be thought of as having presented a problem to Swan that problem is the only problem which he could make any claim to have solved by his guard lips and blade cutout corners.

It was common practice in the prior safety razor art to cut out the corners of the blade to fit the razor and also to protect the corners of the blade by lugs or projections on the guard projecting into the plane of the corners. This is fully illustrated in the following prior art patents: Reed, No. 896,153 of 1908; Hetlyn, No. 1,028,461 of 1912; Ballreich, No. 1,246,219 of 1917; Marchese (Canadian), No. 173,126 of 1916; Eklund, No. 1,557,676 of 1925; Hoffman, No. 1,602,613 of 1926; and Hall (British), No. 284,800 of 1928.

It was also common practice in the prior safety razor art to provide lugs or projections on razor caps in combination with cutout corner blades. This is illustrated in the following prior art patents: Hayes (British), No. 206,212 of 1923; Wrede, No. 1,203,089 of 1916; Carreras, No. 1,000,235 of 1911; Echter (German), No. 231,191 of 1911.

None of these prior art patents were cited against the application for the patent in suit except Wrede.

It was not invention to cut out the corners of a safety razor blade and provide projections on the cap or guard to protect the corners of the blade. It was not invention to cut out the corners of a safety razor blade to avoid the burrs, formed by dropping, on the corners of the razor cap or to accommodate reinforcing lugs placed on the cap corners.

Thompson patent No. 1,924,262 covering cutout corner blades was before the

Circuit Court of Appeals for the Second Circuit. The court dealt with the Thompson claims that were copied by Swan in his application. So, in effect, the court dealt with the Swan claims.

The court held:

"It is said that the original type of Gillette razor suffered the infliction of burrs on the cap whenever the cap was accidentally dropped. It oftentimes resulted in bending over a corner of the cap to an extent sufficient, so that when the clamping pressure was applied to the blade it produced an uneven edge exposure, or even cracked or broke off a portion of the blade. The burrs, it is said, cause the blade edges to be unevenly exposed, with the result that the razor exerts a pull on the beard or might cause the user to cut himself. It is said that those results occur frequently, even when the bending of the cap corner is unnoticeable or slight. To overcome this problem, Thompson labored, and won the grant of an invention for the blade in question.

"The problem thus presented is said to have been overcome by re-enforcing the corners of the cap by building up a lug on the under side of each corner and then discovering the patented blade by constructing the known type of safety razor blade so as to place re-entrant recessions in the four corners of the blade—that is, cutting out the corners to fit the lugs. Thus the patent is for a blade with recesses in the four corners to accommodate the lugs."

After quoting one of the claims of the Thompson patent, the court points out that in one of the earlier cases, Gillette Safety Razor Co., 2 Cir., 64 F.2d 6, it had held: "that it was an obvious and inevitable thing to do, to cut the blade to fit the bar; that replacement blades must necessarily have a long slot in addition to the corner notches. We refused to hold this same appellant guilty of contributory infringement for building its blade as there described. Moreover, we said that removing the small amount of metal from the corners of the old three-hole blade did not weaken the blade nor materially change the distribution of stresses to which it was subjected, and that for all practical purposes the new blade was substantially the same as the three-hole blade. The same reasoning is appropriate here."

Referring specifically to the Thompson patent in suit the court continues:

"Here the notches in the blade are placed there to span the burrs which may be formed if the cap is accidentally dropped, whereas, in the consideration of patent No. 1,815,745 (Gillette Safety Razor Co. v. Standard Safety Razor Co., C.C.A., 64 F. 2d 6), it was claimed that the notches in the corners of the blade were placed there to span the reinforcing lugs on the cap corners. Both blades are identical, as a comparison will illustrate. Whether the notches span a lug or a burr, they are alike —a similar task for mechanical construction. The earlier Thompson patent had no claims for a blade per se, but was for a razor having a corner-re-enforced cap plus a notched blade. The charge there was contributory infringement.

"The simplicity of accomplishing this result or, in other words, solving the problem, required no inventive thought. The type of blade was not new. If anything, all that was new was the cutting of the recesses in the corners, that is, cutting the corners of the flexible blade used for the Gillette-type safety razor. As we said in Gillette Safety Razor Co. v. Standard Safety Razor Co. [2 Cir.], 64 F.2d 9, 'it was the obvious and inevitable thing to do to cut the blade to fit the bar.' So it was here necessary to cut the blade to accommodate the lugs."

The court concluded by holding: "We need not consider the prior art references, for we are content to rest our decision upon the want of invention in placing recesses in the corners of a flexible safety razor blade." Gillette Safety Razor Co. v. Standard Safety Razor Corp., 2 Cir., 74 F.2d 691, 692.

The Court of Appeals for the Second Circuit specifically held that the idea which Thompson had of cutting out the blade corners to span the cap corners and avoid burrs, as well as his afterthought of placing reinforcing lugs on the cap corners, was not invention. The court so held without finding it necessary to examine the prior art.

Faced with this decision plaintiff stresses the different form of the claims in the patent in suit and of the Thompson patent. This difference is of no significance because both forms contain only a single idea which the Court of Appeals held was not invention.

There is no inconsistency in the fact that defendant obtained two patents for two of the forms of claims and was also

670

seeking the third form of claims involved in the interference. It is well settled that patents that issue upon applications copending in the Patent Office are not prior art as to each other and need not involve invention over each other. Especially is this true if the patents are based upon the same original application.

 Plaintiff's brief is replete with quotations from defendant's statements as to the importance to the defendant of Thompson's idea in the light of the difficulty which defendant had experienced from damaged cap corners. However, Swan's guard lips and blade cutouts left the difficulty just where it was before. Swan's razor caps are just as susceptible to damage as the original Gillette caps and both of Swan's forms of razors are rendered inoperative by burrs formed on the cap corners. Since the Swan patent does not disclose any solution of defendant's difficulty plaintiff is in no position to argue that defendant should be estopped from denying the validity of the patent in suit because of defendant's previous attempts to enforce the Thompson patents.

It has long been settled that there is no estoppel because of the above circumstances. The Supreme Court recently said: "However inconsistent this early attempt to procure a patent may be with petitioner's present contention of its invalidity for want of invention, this Court has long recognized that such inconsistency affords no basis for an estoppel, nor precludes the court from relieving the alleged infringer and the public from the asserted monopoly when there is no invention. Haughey v. Lee, 151 U.S. 282, 285, 14 S.Ct. 331, 38 L. Ed. 162." Paramount Publix Corp. v. Tri-Ergon Corp., 294 U.S. 464, 477, 55 S.Ct. 449, 455, 79 L.Ed. 997.

In the earlier case cited, Haughey v. Lee, the Supreme Court said: "There is no merit in the proposition made in the second assignment of error, that defendants are estopped from asserting that there is no patentable novelty in plaintiff's invention by their conduct in seeking to procure, through one of their employes, a patent for substantially the same invention. Whether or not there is any inconsistency in trying at one time to get a patent for a supposed invention, and in afterwards alleging, as against a rival successful in obtaining a patent, that there is no novelty in the invention, it certainly cannot be said to constitute an estoppel. Besides,

the defense of want of patentable invention in a patent operates, not merely to exonerate the defendant, but to relieve the public from an asserted monopoly, and the court cannot be prevented from so declaring by the fact that the defendant had ineffectually sought to secure the monopoly for himself." Haughey v. Lee, 151 U.S. 282, 285, 14 S.Ct. 331, 332, 38 L.Ed. 162.

 It should be remembered that Swan's patent is a paper patent and must be narrowly construed. Swan made no contribution to the art. The only inventive idea which he claimed to have before he learned of Thompson's razor and blade had been anticipated by his own countryman, Rawson, nearly twenty years before.

The court finds that the evidence in this case is such as to carry thorough conviction that the decision of the Court of Customs and Patent Appeals in the interferences, Swan v. Thompson, 80 F.2d 374, was wrong.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The bill must be dismissed.